**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| DIEM-II, LLC, DIEM-III, LLC, and DIEM-VIII, LLC, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) C.A. No. 2025-0338-BWD ) |
| MAISONETTE INC., NEW ENTERPRISE ASSOCIATES 15, L.P., SYLVANA DURRETT, LUISA MENDOZA, ANTHONY FLORENCE, MARISSA MAYER, PIERRE POIGNANT, and MYRA CORTADO, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM OPINION RESOLVING MOTIONS TO DISMISS**

Date Submitted: March 4, 2026
Date Decided: April 6, 2026

John M. Seaman, E. Wade Houston, Ben Lucy, ABRAMS & BAYLISS LLP, Wilmington, DE; OF COUNSEL: David Elsberg, Silpa Maruri, Jared Ruocco, Brian Campbell, Silas La Borde, ELSBERG BAKER & MARURI PLLC, New York, NY; *Attorneys for Plaintiffs Diem-II, LLC, Diem-III, LLC, and Diem-VIII, LLC.*

Daniel B. Rath, Rebecca L. Butcher, Jennifer L. Cree, Howard W. Robertson IV, LANDIS RATH & COBB LLP, Wilmington, DE; OF COUNSEL: Darrell Cafasso, Alexander K. Talarides, Harry F. Murphy, ORRICK, HERRINGTON & SUTCLIFFE LLP, New York, NY; *Attorneys for Defendants Maisonette Inc., Sylvana Durrett, Anthony Florence, Marissa Mayer, and Pierre Poignant.*

C. Barr Flinn, Paul Loughman, Zeliang Liu, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE; OF COUNSEL: Eric Leon, Nathan Taylor, Connor Clerkin, LATHAM & WATKINS LLP, New York, NY; *Attorneys for Defendant New Enterprise Associates 15, L.P.*

Bruce E. Jameson and John G. Day, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, DE; *Attorneys for Defendant Luisa Mendoza.*

Jaclyn C. Levy and Samuel G. Gustafson, POTTER ANDERSON & CORROON LLP, Wilmington, DE; *Attorneys for Defendant Myra Cortado.*

**DAVID, V.C.**

The length of this memorandum opinion is more reflective of the myriad claims and arguments the parties have devised than the complexity of the factual allegations at issue. Between 2021 and 2024, the plaintiffs invested in Maisonette Inc. ("Maisonette" or the "Company") through a convertible note and two series of preferred stock issuances. Maisonette later restated its financials, suggesting the financial information Maisonette provided to the plaintiffs in connection with their investments was not accurate. Maisonette also represented in purchase agreements with the plaintiffs that there was no action pending against any of its directors or officers, when in fact, one Maisonette director was a defendant in a dozen federal securities lawsuits arising from another company's initial public offering.

The plaintiffs allege claims for fraud, civil conspiracy to commit fraud, breach of contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, violation of the Florida Securities and Investor Protection Act, equitable fraud, conversion, and unjust enrichment against different combinations of defendants, including Maisonette, its directors and two officers, and another investor with representation on Maisonette's board. The defendants have moved to dismiss each of these claims on separate grounds.

Affording the plaintiffs the benefit of all reasonable inferences, this memorandum opinion largely denies the motions to dismiss. Given the outcome,

1

the decision strikes me as one better suited for a transcript ruling. But in an effort to address multitudinous arguments, a lengthy written ruling follows instead.

## I.    BACKGROUND[1]

### A.    The Parties

Maisonette is a Delaware corporation and e-commerce startup that specializes in children's fashion and lifestyle products.   Compl. ¶¶ 3, 23.

Nonparty Diem Investments is an alternative asset management firm that invests in private companies in the software and e-commerce sectors. *Id.* ¶ 22. Diem Investments manages plaintiffs Diem-II, LLC, Diem-III, LLC, and Diem-VIII, LLC (collectively, "Plaintiffs"), Delaware limited liability companies formed to invest in Maisonette. *Id.* ¶¶ 19–23.

Defendants Sylvana Durrett and Luisa Mendoza founded Maisonette in 2016. *Id.* ¶¶ 23–25. Durrett served as Maisonette's Chief Executive Officer ("CEO") at all relevant times, and Mendoza served as its President until May 2024.[2] *Id.* ¶¶ 24–25. Between December 2020 and April 2024, the Board comprised five members:

---

[1] The following facts are taken from the Verified Complaint (the "Complaint") and the documents incorporated by reference therein.  Verified Compl. [hereinafter Compl.], Dkt. 1; *see Allen v. Encore Energy P'rs*, 72 A.3d 93, 96 n.2 (Del. 2013) ("A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint . . . ." (citing *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996))).

[2] Maisonette's board of directors (the "Board") voted to appoint a new President on May 21, 2024, but Mendoza remains on the Board.  Compl. ¶ 150.

2

Durrett, Mendoza, Anthony Florence, Marissa Mayer, and Pierre Poignant (collectively, the "Director Defendants"). *See id.* ¶¶ 24–28.

Defendant New Enterprise Associates 15, L.P. ("NEA 15") is a Delaware limited partnership formed by nonparty New Enterprise Associates, Inc. ("NEA") to invest in Maisonette. *Id.* ¶¶ 26, 30. In 2018, NEA 15 led Maisonette's Series A financing round and secured a contractual right to designate a director on the Board. *Id.* ¶¶ 37–38. NEA 15 designated Florence—NEA's CEO, Managing General Partner, Co-President, and Head of Technology Investing—to the Board. *Id.* ¶¶ 26, 38.

Mayer invested in Maisonette and joined the Board in March 2019. *Id.* ¶ 27. Another investor, nonparty Strategic Investments Group, designated Poignant to the Board in December 2020. *Id.* ¶ 40.

In January 2021, Maisonette completed a $30 million Series B financing round, after which NEA 15 became or remained Maisonette's largest stockholder. *See id.* ¶¶ 42, 47 n.2.

### B. The Note

On July 30, 2021, the Board met in a "closed-door session" with two NEA associates present to discuss Maisonette's cash position and fundraising efforts, which included plans to pursue a Series C financing round by the end of the year. *Id.* ¶¶ 45–46.

Soon after, Maisonette hired defendant Myra Cortado to serve as its Chief Financial Officer ("CFO").[3]  *Id.* ¶ 29.

On September 13, Mendoza contacted Plaintiffs to solicit their participation in the Series C financing round.  *Id.* ¶ 48.  Mendoza provided Plaintiffs with a PowerPoint presentation (the "Series C Pitch Deck") that presented historical and prospective financial information for Maisonette.  *Id.* ¶¶ 53, 55–57.  As alleged in the Complaint, Plaintiffs rely heavily on "unit economics" when evaluating growth-stage startups, under the view that a metric like lifetime value per customer acquisition cost ("LTV/CAC") is more valuable than EBITDA for evaluating startups that are not yet profitable.[4]  Compl. ¶¶ 4 & n.1, 50.  Financial information in the Series C Pitch Deck "demonstrated unit economics of 3.2x LTV/CAC over 2020 and 2021, with a pathway to 4.0x or greater, which would drive [Maisonette] to profitability in 2024 ahead of an anticipated IPO in 2025."  *Id.* ¶ 5.

After reviewing the Series C Pitch Deck, Plaintiffs decided to pursue an investment in Maisonette.  *Id.* ¶ 59.  On October 22, Cortado provided Plaintiffs with

---

[3] This memorandum opinion refers to Maisonette, the Director Defendants, Cortado, and NEA 15 collectively as "Defendants."

[4] LTV/CAC is a ratio of a customer's lifetime value divided by customer acquisition cost, derived by dividing gross profit from a customer over time by the cost to acquire that customer.  *See* Jamie Sullivan & Alex Immerman, *Why Do Investors Care So Much About LTV:CAC?*, Andreessen Horowitz (Aug. 22, 2023), https://a16z.com/why-do-investors-care-so-much-about-ltvcac/.

Maisonette's "unaudited financial statements"[5] for fiscal year ("FY") 2020 and the first three quarters of FY 2021, along with financial projections for the remainder of FY 2021 (the "October 2021 Financial Statements").  Compl. ¶¶ 62–64.

While Plaintiffs were conducting diligence, unbeknownst to them, the Board met on November 16 to discuss Maisonette's operations and financing developments.  *Id.* ¶ 76.  In connection with that meeting, the Board received a slide deck (the "November 2021 Board Deck") that included a slide entitled "Assessment of Finance Capabilities," identifying improvements necessary to bring Maisonette to where a "[h]igh [g]rowth company at [its] stage should be."  *Id.* ¶ 77; Maisonette OB, Ex. 1 [hereinafter Board Deck] at 33.  The slide noted that Maisonette's financial reporting relied on QuickBooks, which had "limited capabilities."  *Id.*  The slide further observed that "[d]ata sources for reporting [we]re directionally correct but not entirely accurate"; "[p]rivate label accounting [was] non-existent"; and the Company had not yet undergone an audit.  *Id.*

On December 13, Plaintiffs purchased a convertible promissory note (the "Note"), governed by New York law, with a face value of $8 million that would

---

[5] The Complaint calls these documents "financial statements" but clarifies that Plaintiffs only "requested a 'company financial model' or the 'key financial metrics over the last few quarters/years.'"  Compl. ¶ 61.  Maisonette's briefing refers to these documents as "unaudited financial metrics."  Opening Br. in Supp. of Defs. Maisonette, Durrett, Florence, Mayer & Poignant's Mot. to Dismiss the Verified Compl. [hereinafter Maisonette OB] at 10, Dkt. 23.

automatically convert into Maisonette Series C preferred stock ("Series C Preferred Stock") upon successful completion of the Series C financing round.[6] Compl. ¶¶ 6, 75, 82–86; *id.*, Ex. 1 [hereinafter Note].

### C. The Series C SPA

On January 10, 2022, Mendoza provided Plaintiffs with new unaudited financial statements for the Company (the "Updated Financial Statements"). Compl. ¶ 89.

On February 2, Plaintiffs executed a Series C Preferred Stock Purchase Agreement (the "Series C SPA"), converting Plaintiffs' initial $8 million investment under the Note into Series C Preferred Stock and investing an additional $2.4 million in Series C Preferred Stock. Compl. ¶¶ 98–99; *id.*, Ex. 2 [hereinafter Series C SPA].

---

[6] The Note states that Plaintiffs' investment "shall be converted into equity securities at the initial closing of the Company's next sale of preferred stock in a single transaction or a series of related transactions yielding gross proceeds to the Company of at least $30,000,000," upon which "[Maisonette] will automatically issue" "a number of shares of Standard Preferred Stock equal to the Conversion Amount divided by the price per share at which the majority of shares of the Standard Preferred Stock are sold to cash investors." Note §§ 2(a), 2(a)(i)(1).

In Section 6 of the Note, Plaintiffs acknowledged that they were "aware of the Company's business affairs and financial condition and ha[d] acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities." Note § 6(c). Plaintiffs also "acknowledge[d] that [they were] not relying upon any person, firm or corporation, other than the Company and its officers and directors, in making [their] investment or decision to invest in the Company." *Id.* § 6(d).

6

Section 1.4 of the Series C SPA states that upon conversion of the Note, Plaintiffs "waive[] . . . any and all demands, claims, suits, actions, causes of action, proceedings, assessments and rights in respect of each of the Note Documents, including, without limitation, past or present actual, deemed or alleged default or event of default under such Note Documents."  Series C SPA § 1.4(e).

In Sections 2.7, 2.14, 2.15, 2.16, and 2.24 of the Series C SPA, Maisonette made representations and warranties concerning litigation, its financial statements, key employees, and the accuracy of representations and warranties.

Section 2.7 of the Series C SPA included the following "Absence of Litigation Representation":

> 2.7 <u>Litigation</u>.  There is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or to the Company's knowledge, currently threatened (i) against the Company or any officer, director or Key Employee of the Company . . . .

*Id.* § 2.7.  Sections 2.14 and 2.15 included the following "Financial Statements Representation" and "Financial Changes Representation":

> 2.14 <u>Financial Statements</u>.  The Company has delivered to each Purchaser its unaudited financial statements as of September 30, 2021 (the "Financial Statements Date") and for the fiscal year ended December 31, 2020 (collectively, the "Financial Statements").  The Financial Statements have been prepared in accordance with generally accepted accounting principles ("GAAP") applied on a consistent basis throughout the periods indicated, except that the unaudited Financial Statements may not contain all footnotes required by GAAP.  The Financial Statements fairly present in all material respects the financial condition and operating results of the Company as of the dates, and for the periods, indicated therein, subject in the case of the unaudited

7

Financial Statements to normal year-end audit adjustments. Except as set forth in the Financial Statements, the Company has no material liabilities or obligations, contingent or otherwise, other than (i) liabilities incurred in the ordinary course of business subsequent to September 30, 2021; (ii) obligations under contracts and commitments incurred in the ordinary course of business; and (iii) liabilities and obligations of a type or nature not required under GAAP to be reflected in the Financial Statements, which, in all such cases, individually and in the aggregate would not have a Material Adverse Effect. The Company maintains and will continue to maintain a standard system of accounting established and administered in accordance with GAAP.

2.15 Changes. Since the Financial Statements Date, there has not been: (a) any change in the assets, liabilities, financial condition or operating results of the Company from that reflected in the Financial Statements, except changes in the ordinary course of business that have not caused, in the aggregate, a Material Adverse Effect . . . .

*Id.* §§ 2.14, 2.15. Section 2.16 included the following "Key Employee Representation":

2.16 Employee Matters. . . . (d) To the Company's knowledge, no Key Employee[7] intends to terminate employment with the Company or is otherwise likely to become unavailable to continue as a Key Employee. The Company does not have a present intention to terminate the employment of any of the foregoing.

*Id.* § 2.16. Finally, Section 2.24 included the following "Disclosure Representation":

2.24 Disclosure. . . . No representation or warranty of the Company contained in this Agreement, as qualified by the Disclosure Schedule,

---

[7] The Series C SPA defines a "Key Employee" to mean "any executive-level employee (including division director and vice president-level positions) as well as any employee or consultant who either alone or in concert with others develops, invents, programs or designs any Company Intellectual Property." Series C SPA § 1.6(f).

8

and no certificate furnished or to be furnished to Purchasers at the Closing contains any untrue statement of a material fact or, to the Company's knowledge, omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

*Id.* § 2.24.

### D. The Casper Litigations

At the time Maisonette and Plaintiffs executed the Series C SPA, Florence, who also served on the board of directors of Casper Sleep Inc. ("Casper"), was a named defendant in a dozen federal securities lawsuits arising from Casper's initial public offering (the "Casper Litigations"). Compl. ¶¶ 16, 111 & n.4, 112.

### E. The Series D SPA

By late 2023 and early 2024, Maisonette was engaged in discussions over a new Series D financing round. Plaintiffs eventually agreed to lead Maisonette's Series D financing round, investing $2.9 million in exchange for Series D preferred stock, a contractual right to designate a director on the Board, and rights to approve the Company's budget. *Id.* ¶¶ 11–12, 128, 131–32.

On April 15, 2024, Plaintiffs executed a Series D Preferred Stock Purchase and Warrant Agreement (the "Series D SPA"). *Id.* ¶ 135; Compl., Ex. 3 [hereinafter Series D SPA]. The Series D SPA included the same definitions and Absence of Litigation Representation, Financial Statements Representation, Financial Changes Representation, Key Employee Representation, and Disclosure Representation as in

9

the Series C SPA. Series D SPA §§ 1.6(f), 2.7, 2.14, 2.15, 2.16, 2.24. In connection with the Series D SPA, Plaintiffs designated Seth Shevlin to the Board. Compl. ¶ 147.

## F. Mendoza's Departure

On April 26, Mendoza sent a letter to members of the Board[8] and Maisonette's outside counsel claiming that she had been "forced out of her role (and defamed) by the actions of Florence, Durrett, and Mayer." *Id.* ¶ 143. The letter "threaten[ed] litigation against [those individuals] and the Company, alleging that they had defamed her and were working to push her out of the Company in an unlawful scheme to retaliate against her and reduce her compensation and/or equity in the Company." *Id.* ¶ 148. Mendoza sent a second letter on May 1. *Id.*

On May 21, the Board held a meeting at which Durrett, Florence, Mayer, and Poignant "determined that no Board action was needed to remove Mendoza as President" because Mendoza had not been validly appointed to that position, and "voted to appoint Adriane Nicholas as President" in her place. *Id.* ¶ 150.

## G. The Restated Financial Statements

Sometime after Shevlin joined the Board in 2024, Plaintiffs learned that two years prior, in 2022, Maisonette had restated its financials (the "Restated Financial

---

[8] The Complaint does not identify which Board members received this letter. *See* Compl. ¶¶ 143, 148.

Statements"). *See id.* ¶¶ 9, 69, 156. The following table compares the lower net revenue, gross profit, gross profit margin, and EBITDA figures disclosed in the Restated Financial Statements with the figures in the Updated Financial Statements that Plaintiffs received before investing in the Note and the Series C SPA:

**FY 2020 Financial Statements**
**($ millions)**

|  | Net Revenue | Gross Profit | Gross Profit Margin | EBITDA |
|---|---|---|---|---|
| Updated Financial Statements | $17.29 | $6.83 | 18.6% | ($13.82) |
| Restated Financial Statements | $16.33 | $4.90 | 13.4% | ($16.50) |
| % Change | (5.6%) | (28.3%) | (28.0%) | (19.4%) |

**FY 2021 Financial Statements**
**($ millions)**

|  | Net Revenue | Gross Profit | Gross Profit Margin | EBITDA |
|---|---|---|---|---|
| Updated Financial Statements | $24.28 | $10.37 | 20.5% | ($25.10) |
| Restated Financial Statements | $22.30 | $6.98 | 13.9% | ($27.91) |
| % Change | (8.2%) | (32.7%) | (32.2%) | (11.2%) |

*Id.* ¶ 91.

## H. Procedural History

On March 31, 2025, Plaintiffs initiated this action through the filing of the Complaint. Dkt. 1. The Complaint asserts ten counts:

11

- Count I alleges a claim for fraud against Maisonette, the Director Defendants, and Cortado premised on alleged misrepresentations in connection with the Note, the Series C SPA, and the Series D SPA. *Id.* ¶¶ 160–71.

- Count II alleges a claim for civil conspiracy to commit fraud against Maisonette, the Director Defendants, Cortado, and NEA 15. *Id.* ¶¶ 172–78.

- Count III alleges a claim for breach of the Series C SPA against Maisonette. *Id.* ¶¶ 179–84.

- Count IV alleges a claim for breach of the Series D SPA against Maisonette. *Id.* ¶¶ 185–89.

- Count V alleges a claim for breach of fiduciary duty against the Director Defendants. *Id.* ¶¶ 190–201.

- Count VI alleges a claim for aiding and abetting breach of fiduciary duty against NEA 15. *Id.* ¶¶ 202–05.

- Count VII alleges a claim for violation of the Florida Securities and Investor Protection Act against Maisonette, the Director Defendants, and Cortado. *Id.* ¶¶ 206–20.

- Count VIII alleges a claim for equitable fraud against all Defendants. *Id.* ¶¶ 221–29.

- Count IX alleges a claim for conversion against Maisonette. *Id.* ¶¶ 230–34.

- Count X alleges an alternative claim for unjust enrichment against all Defendants. *Id.* ¶¶ 235–43.

All Defendants but Mendoza moved to dismiss the Complaint on May 12. Dkts. 10–12. Mendoza moved to dismiss the Complaint on May 19 (collectively, the "Motions to Dismiss"), Dkt. 14, and the parties completed briefing on August 22.[9] The Court heard oral argument on the Motions to Dismiss on January 23, 2026, Dkt. 71, and Plaintiffs submitted supplemental authority on March 4. Dkt. 75.

## II. ANALYSIS

Defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim. When reviewing a motion to dismiss under Rule 12(b)(6), Delaware courts "(1) accept all well pleaded factual allegations as

---

[9] *See* Maisonette OB, Dkt. 23; Opening Br. and Joinder in Supp. of Def. Myra Cortado's Mot. to Dismiss the Verified Compl. [hereinafter Cortado OB], Dkt. 24; Opening Br. in Supp. of Def. New Enterprise Associates 15, L.P.'s Mot. to Dismiss the Verified Compl. [hereinafter NEA OB], Dkt. 25; Def. Luisa Mendoza's Opening Br. in Supp. of Mot. to Dismiss [hereinafter Mendoza OB], Dkt. 29; Pls.' Omnibus Answering Br. in Opp'n to Defs.' Mots. to Dismiss [hereinafter PAB], Dkt. 38; Reply Br. and Joinder in Further Supp. of Def. Myra Cortado's Mot. to Dismiss the Verified Compl. [hereinafter Cortado RB], Dkt. 49; Def. Luisa Mendoza's Reply Br. in Supp. of Mot. to Dismiss, Dkt. 50; Reply Br. in Supp. of Defs. Maisonette, Durrett, Florence, Mayer & Poignant's Mot. to Dismiss the Verified Compl., Dkt. 51; Reply Br. in Supp. of Def. New Enterprise Associates 15, L.P.'s Mot. to Dismiss the Verified Compl., Dkt. 52.

true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the non-moving party . . . ." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

## A. Count I States A Claim For Fraud Against Maisonette, The Director Defendants, And Cortado.

Count I of the Complaint alleges a claim for fraud against Maisonette, the Director Defendants, and Cortado. In short, Plaintiffs allege that they were fraudulently induced into executing the Note, the Series C SPA, and the Series D SPA with misrepresentations concerning (1) Maisonette's financial condition in the October 2021 Financial Statements and the Updated Financial Statements, (2) the absence of pending litigation against directors in the Series C SPA and Series D SPA, and (3) the status of Mendoza as a "Key Employee" in the Series D SPA.

A claim for fraud or fraudulent inducement under Delaware law has five elements:

> (1) a false statement, generally of fact, made by the defendant; (2) the defendant's knowledge or belief that the statement was false at the time it was made, or the defendant's reckless indifference to [the] statement's truth; (3) the defendant's intent to cause the plaintiff to act or refrain from acting as a result of the statement; (4) the plaintiff's justifiable reliance on that statement in acting or in refraining from acting; and (5) damages incurred as a result of that reliance.

14

*Neurvana Med., LLC v. Balt USA, LLC*, 2020 WL 949917, at \*23 (Del. Ch. Feb. 27, 2020) (footnote omitted). "Court of Chancery Rule 9(b) imposes a heightened pleading standard on plaintiffs asserting fraud claims." *Id.* at \*24. Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud." Ct. Ch. R. 9(b). "Under Rule 9(b), the circumstances that must be stated with particularity are the time, place, and contents of the false representation, the identity of the person(s) making the representation, and what he intended to obtain thereby." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003). Though the circumstances of the fraud must be pled with particularity, "[i]t is not necessary under Rule 9(b) to plead knowledge or intent with particularity[.]" *KnighTek, LLC v. Jive Commc'ns, Inc.*, 225 A.3d 343, 353 (Del. 2020).

Defendants argue that Count I must be dismissed because the Series C SPA contains a waiver releasing all claims relating to the Note and, in any event, that the Complaint fails to allege sufficient facts to state a claim for fraud.

### 1. The Series C SPA Does Not Waive Unknown Fraud Claims.

Defendants first argue that Count I must be dismissed to the extent it is based on misstatements made in connection with the Note because Section 1.4(e) of the

15

Series C SPA waived all claims "in respect of" the Note.[10] Maisonette OB at 25–26.

"Delaware courts recognize the validity of general releases." *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1163 (Del. 2010). "If [a] claim falls within the plain language of [a] release, then the claim should be dismissed." *Seven Invs., LLC v. AD Cap., LLC*, 32 A.3d 391, 396 (Del. Ch. 2011). "When determining whether a release covers a claim, 'the intent of the parties as to its scope and effect are controlling, and the court will attempt to ascertain their intent from the overall language of the document.'" *Id.* (quoting *Corp. Prop. Assocs. 6 v. Hallwood Gp. Inc.*, 817 A.2d 777, 779 (Del. 2003)).

Under at least one reasonable reading of Section 1.4(e), the parties did not voluntarily and intentionally relinquish the right to pursue unknown fraud claims. Section 1.4 addresses conversion of the Notes into Series C Preferred Stock. It extinguishes Maisonette's ongoing obligations under the Note, explaining that "[u]pon conversion of the Convertible Notes, the Company shall have no further obligations under the Convertible Notes and the Convertible Notes shall be

---

[10] Defendants briefed additional waiver arguments under Sections 4 and 7 of the Note but withdrew them during oral argument. *See* Tr. of 1-23-2026 Oral Arg. on Mots. to Dismiss at 25:10–16, Dkt. 74.

cancelled." Series C SPA § 1.4(d). Section 1.4(e) then waives Maisonette's past failures under the Note:

> Other than each Conversion Purchaser's right to receive the Shares set forth opposite such Conversion Purchaser's name on Exhibit A and the rights provided for in this Agreement and the Transaction Agreements . . . as a holder of Shares, each Conversion Purchaser hereby *waives* (on behalf of himself, herself, or itself, as applicable) *any and all* demands, *claims*, suits, actions, causes of action, proceedings, assessments and rights *in respect of each of the Note Documents*, *including*, without limitation, *past or present* actual, deemed or alleged *default* or event of default under such Note Documents . . . .

Series C SPA § 1.4(e) (emphasis added). While Section 1.4(e) releases claims "in respect of" the Notes—such as "actual, deemed or alleged default"—it arguably does not evince a "voluntary and intentional relinquishment of a known right" to pursue unknown claims for fraud. *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1289 (Del. 1994).

Notably, if the parties had intended to broadly release unknown fraud claims, they could have done so explicitly, but they did not. *See Jhaveri v. K1 Inv. Mgmt. LLC*, 2025 WL 1779507, at *8 (Del. Ch. June 27, 2025) (finding a general release barred fraud claims where the release stated that "[plaintiff] understands that this is a full and final general release of all claims, demands, causes of action, [l]osses, liabilities and obligations of any nature whatsoever, *whether or not known* . . . ." (emphasis added)); *Schonfeld Gp. Hldgs., LLC v. Trillium Hldgs., LLC*, 2012 WL 727777, at *2, *4 (Del. Ch. Mar. 6, 2012) (explicitly releasing claims "whether

17

known or unknown"); *Seven Invs.*, 32 A.3d at 396 ("The [g]eneral [r]elease explicitly extinguished all claims, *known or unknown*, arising out of or in any way related to the . . . [a]greements." (emphasis added)). Because Section 1.4(e) of the Series C SPA does not unambiguously waive claims for fraud, the Motions to Dismiss Count I based on waiver are denied.

## 2. The Complaint Alleges False Statements.

Defendants' primary contention is that the Complaint fails to plead facts supporting the elements of a claim for fraud. Defendants argue, first, that the Complaint fails to plead facts supporting an inference that any Defendant made a false statement. Plaintiffs respond that the Complaint adequately alleges false statements concerning Maisonette's financial condition in the October 2021 Financial Statements and the Updated Financial Statements; the absence of pending litigation against directors in the Series C SPA and Series D SPA; and the status of Mendoza's availability as a "Key Employee" in the Series D SPA.

### a. The Complaint Alleges Misstatements In Connection With The Note.

Plaintiffs allege that to induce their investment in the Note, the Director Defendants, Cortado, and Maisonette provided them with the Series C Pitch Deck and October 2021 Financial Statements, which falsely represented the Company's financial condition, as later revealed by the Restated Financial Statements. Although the Restated Financial Statements reflect lower net revenue, gross profit, gross profit

margin, and EBITDA figures than the ones disclosed to Plaintiffs in the Series C Pitch Deck and October 2021 Financial Statements, Defendants contend that any misstatements of financial information in those documents are either "immaterial Backward-looking Metrics or inactionable Forward-Looking Projections." Maisonette OB at 27.

"[I]ssues of materiality are generally held to be mixed questions of law and fact, but predominantly questions of fact," making materiality difficult to assess on a motion to dismiss. *Wells Fargo & Co. v. First Interstate Bancorp.*, 1996 WL 32169, at *10 (Del. Ch. Jan. 18, 1996). Despite Defendants' arguments to the contrary, the Court cannot conclude from the pleadings that inaccurate historical information in the Series C Pitch Deck and October 2021 Financial Statements was immaterial to Plaintiffs' investment decision as a matter of law. This is particularly true given that a representation that financial statements fairly present a company's financial condition is "one of the most important representations in any acquisition agreement." *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1042 (Del. Ch. 2006).

To advance their materiality argument, Defendants seize on Plaintiffs' allegations that "commonplace valuation metrics like EBITDA multiples are rarely used to assess startups" because "startup businesses frequently have negative earnings during the first several years of their existence." Maisonette OB at 28

19

(quoting Compl. ¶ 50). According to Defendants, because Plaintiffs focus on "unit economics" like LTV/CAC to predict the growth potential of startup businesses, historical financial information must be immaterial to their investment decisions. *Id.* Defendants' attempt to portray Plaintiffs' investment thesis as wholly divorced from historical financial information makes little sense, as the unit economics on which Plaintiffs relied were derived from Maisonette's historical performance.[11] *See, e.g.*, Compl. ¶¶ 5, 9, 59.

Further, to the extent Defendants suggest that Plaintiffs relied solely on forward-looking projections derived from unit economics metrics, dismissal is nevertheless inappropriate where forward-looking information was extrapolated from false historical information. *See DG BF, LLC v. Ray*, 2021 WL 776742, at *23 (Del. Ch. Mar. 1, 2021) (declining to dismiss fraud claim based on projections because "[t]o the extent the projections were based on [the company's] past financial performance, those numbers were fraudulent"). Thus, the Court cannot conclude that misstated financial information in the Series C Pitch Deck and October 2021 Financial Statements was immaterial or inactionable as a matter of law.

---

[11] *See* PAB at 27 ("[Plaintiffs'] claim is based upon fraudulent unit economics that were matters of historical fact, calculated based on misstated gross profit and profit margin figures that appeared in the fraudulent Series C [Pitch] Deck, [October 2021] Financial Statements, and Updated Financial Statements." (citing Compl. ¶¶ 54–55, 69–74, 89–93)).

Because the Complaint adequately alleges misstatements of historical information, the Court need not further parse whether additional forward-looking misstatements are also actionable.

### b. The Complaint Alleges Misstatements In Connection With The Series C SPA.

Plaintiffs allege that to induce their investment in the Series C SPA, the Director Defendants, Cortado, and Maisonette provided them with the Updated Financial Statements, which, like the Series C Pitch Deck and the October 2021 Financial Statements, falsely represented the Company's financial condition, again evidenced by the Restated Financial Statements.

Like the Series C Pitch Deck and the October 2021 Financial Statements, the Updated Financial Statements provided to Plaintiffs included higher net revenue, gross profit, gross profit margin, and EBITDA figures than those later reflected in the Restated Financial Statements. For the same reasons explained above, the Complaint alleges an actionable misrepresentation in the Updated Financial Statements. *See supra* pp. 18–20.

Separately, Plaintiffs allege that the Absence of Litigation Representation in the Series C SPA was false. That representation stated that "[t]here [wa]s no . . . action, suit, proceeding, arbitration, complaint, charge or investigation

21

pending . . . against . . . any . . . director,"[12] when, in fact, Florence was a defendant in the Casper Litigations. Defendants do not contest for purposes of the Motions to Dismiss that the Absence of Litigation Representation was false when made, but argue that the representation was not material because federal securities lawsuits are "standard fare for board directors of any company . . . after an initial public offering" and the Casper Litigations "ha[d] no bearing on Florence's participation in Maisonette or the value of [Plaintiffs'] investment in the Company." Maisonette OB at 36.

Again, "[a] question of materiality is difficult to treat as a question of law on a motion to dismiss." *Davidow v. LRN Corp.*, 2020 WL 898097, at *11 (Del. Ch. Feb. 25, 2020) (quoting *Wells Fargo*, 1996 WL 32169, at *10). Defendants may later show that the Casper Litigations were immaterial strike suits. But at the pleadings stage, the fact that Plaintiffs bargained for, and were entitled to rely on,[13] the Absence of Litigation Representation supports a reasonable inference that the misrepresentation was material to Plaintiffs. *See Abry P'rs*, 891 A.2d at 1051

---

[12] Series C SPA § 2.7.

[13] *See* Series C SPA § 3.3 (Purchaser's opportunity to discuss the business "does not limit or modify the representations and warranties of the Company in Section 2 of this Agreement or the *right of the Purchasers to rely thereon*" (emphasis added)); *id.* § 3.10 ("The Purchaser acknowledges that it is not relying upon any Person, *other than the Company and its officers and directors*, in making its investment or decision to invest in the Company.") (emphasis added); *see also* Series D SPA §§ 3.3, 3.10 (same).

(concluding that a plaintiff adequately alleged "statements were materially false" when the "statements were represented and warranted in the [a]greement and were therefore intended to induce the [b]uyer to sign the [a]greement and close the sale to purchase the [c]ompany"); *cf. Prairie Cap. III LP v. Double E Hldg. Corp.*, 132 A.3d 35, 62 (Del. Ch. 2015) ("It is reasonably inferable that defendants intended to induce reliance on the representations because they appeared in a written agreement.").

### c. The Complaint Alleges Misstatements In Connection With The Series D SPA.

Plaintiffs allege that to induce their investment in the Series D SPA, the Director Defendants and Maisonette made the same Absence of Litigation Representation as in the Series C SPA. The Complaint adequately alleges a misstatement in connection with the Series D SPA for the same reasons explained above. *See supra* pp. 21–23.

Separately, Plaintiffs allege that the Key Employee Representation in the Series D SPA was false. That representation stated that "[t]o the Company's knowledge, no Key Employee intend[ed] to terminate employment with the Company or [wa]s otherwise likely to become unavailable to continue as a Key

23

Employee[,]" and "[t]he Company d[id] not have a present intention to terminate the employment of any of the foregoing."[14]  Series D SPA § 2.16(d).

The Complaint fails to allege facts supporting an inference that the Key Employee Representation was untrue when made—in other words, that Mendoza (as the Key Employee at issue) intended to terminate her employment with the Company or was likely to "become unavailable," or that Maisonette had a "present intention" to terminate her.  The Complaint alleges that eleven days *after* the Series D SPA was signed, Mendoza sent a letter to Maisonette directors threatening a lawsuit, Compl. ¶ 139, and nearly a month later, the Board voted to hire a new President. *Id.* ¶ 150.  Those allegations do not support an inference that Mendoza intended to (or did) terminate her employment or became "unavailable" prior to the execution of the Series D SPA on April 15.  Nor do they support an inference that the Company intended to terminate Mendoza as of that date.  At most, these allegations suggest that when the Series D SPA was signed, Mendoza may have planned to threaten legal action against the Company—but again, not that she intended to terminate her own employment or that the Board anticipated doing so.

---

[14] The Series D SPA also represented that "[s]ince the Financial Statements Date, there has not been: . . . (g) any resignation or termination of employment of any officer or Key Employee of the Company."  Series D SPA § 2.15(g).  The Complaint does not allege that Mendoza resigned or was terminated before the Series D SPA was signed.

24

### d. Which Defendants Conceivably "Made" The Misstatements?

"One seeking to impose liability for fraud upon an agent, officer or employee of a corporation as an individual . . . must both allege and prove facts sufficient to impose liability upon him as an individual defendant." *St. James Recreation, LLC v. Rieger Opportunity P'rs, LLC*, 2003 WL 22659875, at *8 n.41 (Del. Ch. Nov. 5, 2003) (quoting 18B Am. Jur. 2d *Corporations* § 1882 (2003)). "This is particularly true when, for example, two or more agents are involved and the facts relating to liability are different as between them, with the result that one or more agents might not be held to be individually liable for the fraud, depending upon such facts." *Id.* (quoting 18B Am. Jur. 2d *Corporations* § 1882 (2003)). "A plaintiff cannot lump together defendants but must 'identify specific acts of individual defendants' and 'who made any particular misrepresentation.'" *Trusa v. Nepo*, 2017 WL 1379594, at *9 (Del. Ch. Apr. 13, 2017) (quoting *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *8 & n.48 (Del. Ch. Jan. 30, 2015)).

The Complaint sufficiently alleges that the Director Defendants, Cortado, and Maisonette "made" the misstatements in the Series C Pitch Deck, October 2021 Financial Statements, and Updated Financial Statements. The Complaint alleges that "[t]he Series C [Pitch] Deck was prepared or reviewed and approved by each of" the Director Defendants, after which "Mendoza caused [the Series C Pitch Deck] . . . to be sent to [Plaintiffs]." Compl. ¶ 53. The Complaint further alleges that "in

25

preparation for the Series C financing, Cortado prepared . . . updated versions of the Company's financial statements" and then, "at the direction of the [Director Defendants] and with the knowledge and authorization of each of them," "transmitted" the financial statements to Plaintiffs before they executed the Note. *Id.* ¶¶ 62, 89. At the pleadings stage, allegations that the financial statements were "prepared by" Cortado and "reviewed, adopted and approved by" the Director Defendants are "sufficiently specific to ascribe the misleading statements in [those documents] to all of those parties." *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 145 (Del. Ch. 2004).[15]

Cortado urges that misstatements in the financial statements cannot be attributed to her because she merely "transmitted the Company's financial statements when directed to do so by the Board or prepared updated statements for the Company," Cortado OB at 7, and "was doing exactly what a CFO should— reviewing the Company's historical reporting processes and suggesting improvements." Cortado RB at 8. Given Cortado's limited time at Maisonette prior to the Series C financing, this argument may very well carry the day later on, but at this early stage, the Court must accept the allegations of the Complaint as true and

---

[15] Because Mendoza allegedly reviewed and approved the financial statements at issue as a member of the Board, her arguments that the Complaint does not allege with particularity that she made any misstatement cannot stand. *See* Mendoza OB at 5–14.

draw all reasonable inferences in Plaintiffs' favor. Doing so, I conclude that the Complaint supports an inference that false statements in the financial documents may be attributed to Cortado as well as the Director Defendants.

The Complaint also sufficiently alleges that the Director Defendants[16] made the false Absence of Litigation Representation by reviewing and approving the Series C SPA and Series D SPA. *See* Compl. ¶ 97 (alleging that the Director Defendants "signed a written consent approving a Board resolution approving the terms of, and 'direct[ing]' the Company to enter into, the Series C SPA"); *id.* ¶ 134 (alleging that "[e]ach of [the Director Defendants] reviewed the terms of the Series D SPA . . . and directed the Company to consummate the Series D transaction"); *Metro Commc'n Corp. BVI*, 854 A.2d at 145 (at the pleading stage, ascribing false statements in reports to the parties who "reviewed, adopted, and approved" those reports).

### 3. The Complaint Adequately Alleges Scienter.

After identifying a misrepresentation, a plaintiff must allege that each defendant knew that the representation was false or made the misrepresentation with reckless indifference to the truth. *Brody v. DCiM Sols., LLC*, 2025 WL 1802239, at *9 (Del. Ch. June 30, 2025) (citing *Great Hill Equity P'rs IV, LP v. SIG Growth*

---

[16] Plaintiffs do not allege that Cortado made the Absence of Litigation Representation.

*Equity Fund I, LLLP*, 2018 WL 6311829, at \*32 (Del. Ch. Dec. 3, 2018)). "[W]hen a plaintiff pleads a claim of fraud that charges that the defendants knew something, it must allege sufficient facts from which it can reasonably be inferred that this 'something' was knowable and that the defendants were in a position to know it." *Abry P'rs*, 891 A.2d at 1050. "[T]he position-to-know test simply describes the allegations that make it reasonably conceivable that a defendant knew something." *Matrix Parent, Inc. v. Audax Mgmt. Co.*, 319 A.3d 909, 934 (Del. Super. Ct. 2024).

### a. The October 2021 Financial Statements And Updated Financial Statements

Plaintiffs contend that the Director Defendants, Cortado, and Maisonette either knew the October 2021 Financial Statements and Updated Financial Statements misstated Maisonette's historical financial performance, or acted with reckless indifference to the truth of the financial information reported in those documents.

To support this argument with respect to the Director Defendants, Plaintiffs primarily rely on a slide entitled "Assessment of Finance Capabilities" in a November 2021 Board Deck that was shared with the entire Board. *See* Board Deck at 33. The slide noted that Maisonette's financial reporting relied on QuickBooks, which had "limited capabilities," and explained that "[d]ata sources for reporting [we]re directionally correct but not entirely accurate"; "[p]rivate label accounting [was] non-existent"; and Maisonette had not yet undergone an audit. *Id.* The

28

inference of scienter Plaintiffs seek to draw from this single slide is weak. The slide itself describes Maisonette's reporting as "directionally correct," and the Director Defendants personally invested tens of millions of dollars in the Series C financing round, seemingly based on the same financial information provided to Plaintiffs. Maisonette OB at 34–35. But drawing all reasonable inferences in Plaintiffs' favor, as I must, I find it is reasonably conceivable—if only barely so—that the Director Defendants disseminated the October 2021 Financial Statements and Updated Financial Statements knowing that the financial information therein was "not entirely accurate." Board Deck at 33.

Cortado argues that she is differently situated than the Director Defendants because she joined Maisonette as CFO in the midst of Maisonette's Series C fundraising efforts. Given that timing, she argues that it is not "reasonable to infer . . . that Ms. Cortado should have conducted a complete audit of [Maisonette's] historical financials months into the job." Cortado OB at 7. This argument misstates Plaintiffs' position, which is not that Cortado breached a duty by failing to undertake an audit. Rather, Plaintiffs allege that Cortado, as Maisonette's CFO, prepared financial statements to provide to potential investors, including Plaintiffs, knowing that the financial information therein was "not entirely accurate." Board Deck at 33; Compl. ¶ 89. Again, Cortado argues that she believed the financial statements were "directionally correct," but still, the Court must draw all reasonable inferences in

29

Plaintiffs' favor at this stage. The Complaint adequately alleges—again, just barely—that both the Director Defendants and Cortado acted with scienter with respect to the October 2021 Financial Statements and Updated Financial Statements.

Because, as alleged, the Director Defendants and Cortado disseminated false statements to benefit Maisonette, "[t]heir knowledge and acts are imputed to [Maisonette,]" such that the Complaint adequately pleads scienter for Maisonette as well. *NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at *12 (Del. Ch. Aug. 2, 2023); *see, e.g.*, *Metro Commc'n Corp. BVI*, 854 A.2d at 153–55 (imputing scienter to a company where its manager made false statements); *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 140 n.15, 176 (Del. Ch. 2023) (imputing knowledge to entities when individuals were acting on their behalf).

#### b.      Absence Of Litigation Representation

Plaintiffs also allege that the Director Defendants and Maisonette knew or were in a position to know that the Absence of Litigation Representations in the Series C SPA and Series D SPA were false when made.

The Complaint adequately alleges that Florence knew that the Absence of Litigation Representations were false because he personally was a defendant in the Casper Litigations. The Complaint further "supports a plausible inference that [Florence] w[as] acting on behalf of" Maisonette, "making it reasonably conceivable

30

that [the Company] could be held liable for the fraud." *LVI Gp. Invs., LLC v. NCM Gp. Hldgs., LLC*, 2018 WL 1559936, at *13 (Del. Ch. Mar. 28, 2018).

Whether the Complaint supports a reasonable inference of scienter on the part of the other Director Defendants with respect to this representation is, to my mind, a very close call. The Complaint alleges on information and belief that the Director Defendants knew the Absence of Litigation Representations were false, but it does *not* allege that the Board ever actually discussed the Absence of Litigation Representations or the Casper Litigations. *See* Compl. ¶ 112. Instead, Plaintiffs argue that the other Director Defendants knew or were in a position to know that Florence was a defendant in the Casper Litigations, rendering the Absence of Litigation Representations false, because the Director Defendants approved the terms of the Series C SPA and Series D SPA, had access to Florence as their co-director, and could have discovered the Casper Litigations from public filings. *See* PAB at 39–40. I conclude that, affording Plaintiffs the benefit of all reasonable inferences, these allegations are sufficient to clear the low bar to aver knowledge generally. *See Abry P'rs*, 891 A.2d at 1050 ("[S]tate of mind and knowledge may be averred generally pursuant to Rule 9(b) because 'any attempt to require specificity in pleading a condition of mind would be unworkable and undesirable.'" (quoting *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 (Del. 1993))). Whether Plaintiffs will bear their difficult burden at trial

31

to prove scienter on the part of the Director Defendants is yet to be determined, but drawing all inferences in favor of Plaintiffs, as I must, it is reasonably conceivable that the Director Defendants knew or should have known that the Absence of Litigation Representations were false.

### 4. The Remaining Elements Of A Fraud Claim Are Adequately Pled.

The Complaint adequately pleads the remaining elements of a fraud claim under Delaware law. "When a party sues based on a written representation in a contract, . . . satisfying the remaining elements [of fraud] at the pleading stage is relatively straightforward." *Levy Fam. Invs., LLC v. Oars + Alps LLC*, 2022 WL 245543, at \*6 (Del. Ch. Jan. 27, 2022) (alteration in original) (quoting *Prairie Cap.*, 132 A.3d at 62).

As set forth above, Plaintiffs adequately allege that the Director Defendants, Cortado, and Maisonette made false representations in connection with the Note, the Series C SPA, and (except for Cortado) the Series D SPA, and did so knowingly. Plaintiffs allege that those Defendants did so to induce Plaintiffs' investment and that Plaintiffs relied on those representations when investing. Compl. ¶¶ 161, 165. Moreover, as to the contractual representations, it is "reasonably inferable that the defendants intended to induce reliance on the representations because they appeared in a written agreement." *Levy Fam. Invs.*, 2022 WL 245543, at \*6 (quoting *Prairie Cap.*, 132 A.3d at 62).

It is likewise reasonable to infer that Plaintiffs did rely on the alleged misrepresentations when deciding to invest and suffered damages as a result. Compl. ¶¶ 59, 70, 72, 82, 99, 146, 210; *see, e.g.*, *Prairie Cap.*, 132 A.3d at 62 (concluding that a plaintiff adequately alleged intent to induce reliance, reliance, and damages where a contractual representation allegedly was false and caused plaintiff "harm because it entered into an agreement it otherwise would not have signed"); *NetApp*, 2023 WL 4925910, at *15–16 (finding after trial that a plaintiff proved intent to induce reliance and justifiable reliance where the "[plaintiff] relied on [the defendant's] financial submissions when considering whether to pursue the deal").

*          *          *

As set forth above, the Motions to Dismiss Count I are denied in part and granted in part.

### B. Counts III And IV State Claims For Breach Of Contract Against Maisonette.

Counts III and IV allege claims against Maisonette for breach of the Series C SPA and Series D SPA, respectively.

Plaintiffs assert breaches of Sections 2.7, 2.14, 2.15(a), 2.15(m), and 2.24 of the Series C SPA and Sections 2.7, 2.15(g), 2.16(d), 2.16(f), and 2.24 of the Series D SPA. "Under Delaware law, a breach of contract claim comprises three elements: (1) the existence of a contract; (2) a breach of an obligation imposed by that contract; and (3) resultant damages." *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL

33

3337531, at *9 (Del. Ch. July 6, 2018) (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).

Section 2.24 of both the Series C SPA and Series D SPA states that "[n]o representation or warranty of the Company . . . contains any untrue statement of a material fact." Series C SPA § 2.24; Series D SPA § 2.24. I concluded above that the Complaint alleges facts supporting an inference that the Absence of Litigation Representations in Section 2.7 of the Series C SPA and Series D SPA were false. *See supra* pp. 21–23. This satisfies the first and second elements of a breach of contract claim.

Defendants argue that the Complaint fails to allege that the false Absence of Litigation Representations resulted in any damage to Plaintiffs. Maisonette OB at 49–50. At this stage, Plaintiffs need not plead "a statement of damages with precision." *Eni Hldgs., LLC v. KBR Gp. Hldgs., LLC*, 2013 WL 6186326, at *22 (Del. Ch. Nov. 27, 2013). It is sufficient that Plaintiffs plead some theory of compensable harm. Plaintiffs contend that they invested millions of dollars in reliance on Maisonette's contractual representations and warranties, and that "the breaches of those representations resulted in [Plaintiffs] receiving interests worth substantially less than they would otherwise have been, and which [Plaintiffs] would not have purchased." PAB at 54. *See Prairie Cap.*, 132 A.3d at 62 (explaining that a "plaintiff can claim causally related harm because it entered into an agreement it

otherwise would not have signed"; concluding that the plaintiff adequately alleged damages where it "sufficiently allege[d] that it acquired a company it would not have purchased, or at least would have paid materially less to own"). This theory of harm is sufficient to support a claim for breach of contract on the pleadings.

Because Counts III and IV state claims for breach of at least one contractual provision, I decline to address Plaintiffs' myriad other theories of breach and Maisonette's responses thereto—including, for example, whether alleged misrepresentations in the Company's financial statements rendered false Maisonette's representation in Section 2.14 of the Series C SPA that "[t]he Financial Statements fairly present *in all material respects* the financial condition and operating results of the Company." Series C SPA § 2.14 (emphasis added); *see inVentiv Health Clinical, LLC v. Odonate Therapeutics, Inc.*, 2021 WL 252823, at *4 (Del. Super. Ct. Jan. 26, 2021, revised Feb. 18, 2021) ("[A]t the pleading stage of a case, a trial judge is not a robed gardener employing Rule 12(b)(6) as a judicial shear to prune individual theories from an otherwise healthily pled claim or counterclaim.").

The Motions to Dismiss Counts III and IV are denied.

### C. Count V States A Claim For Breach Of Fiduciary Duty Against The Director Defendants.

Count V alleges a claim for breach of fiduciary duty against the Director Defendants. Plaintiffs allege that the Director Defendants breached their fiduciary

duty of disclosure by approving the false Absence of Litigation Representation in the Series D SPA when seeking stockholder approval to amend Maisonette's certificate of incorporation in connection with the Series D financing round. Compl. ¶¶ 193, 199.

"When directors request discretionary stockholder action, they must disclose fully and fairly all material facts within their control bearing on the request. This application of the fiduciary duties of care and loyalty is referred to as the 'fiduciary duty of disclosure.'" *Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020) (footnote omitted). "It is well-established that the duty of disclosure 'represents nothing more than the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action.'" *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996) (quoting *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992)). "Directors breach their fiduciary duty of disclosure when the 'alleged omission or misrepresentation is material.'" *Dohmen*, 234 A.3d at 1168 (quoting *Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1998)). "[A] beneficiary need not demonstrate other elements of proof—reliance, causation, or damages." *Id.* Information is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having

significantly altered the 'total mix' of information made available." *Arnold*, 650 A.2d at 1277 (emphasis omitted).

For the same reasons the Absence of Litigation Representation supports a claim for fraud against the Director Defendants, it also supports a conceivable breach of the duty of disclosure. *See supra* pp. 21–23. The Director Defendants' primary argument for dismissal of Plaintiffs' fiduciary duty claim is that it is duplicative of their breach of contract claim. Maisonette OB at 51–54. When a "fiduciary duty claim . . . arises from a dispute relating to the exercise of a *contractual* right," then "any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous." *Ogus v. SportTechie, Inc.*, 2020 WL 502996, at *11 (Del. Ch. Jan. 31, 2020) (emphasis in original) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010)). In other words,

> the general rule under Delaware law, subject to only narrow exceptions, is that a plaintiff may not "bootstrap" a breach of fiduciary duty claim into a breach of contract claim merely by restating the breach of contract claim as a breach of fiduciary duty. Courts will dismiss the breach of fiduciary [duty] claim where the two claims overlap completely and arise from the same underlying conduct or nucleus of operative facts.

*Grunstein v. Silva*, 2009 WL 4698541, at *6 (Del. Ch. Dec. 8, 2009) (footnote omitted). "This bootstrapping case law only requires dismissal where a fiduciary duty claim wholly overlaps with a concurrent breach of contract claim." *Bäcker v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 109 (Del. 2021). If the fiduciary duty

claims "depend on additional facts" or "involve different considerations in terms of a potential remedy," both claims may proceed. *Id.* (quoting *Schuss v. Penfield P'rs, L.P.*, 2008 WL 2433842, at \*10 (Del. Ch. June 13, 2008)).

I cannot conclude at this stage that Plaintiffs' fiduciary duty claim is wholly duplicative of their breach of contract claim. While the contract claim concerns the breach of a representation in the Series D SPA, the fiduciary duty claim is premised on the disclosure of false information when requesting stockholder action to amend the certificate of incorporation. It is possible that these claims could give rise to different remedies. The Motions to Dismiss Count V are therefore denied.

**D.     Count VII States A Claim For Violation Of The Florida Securities and Investor Protection Act Against The Director Defendants, Cortado, And Maisonette.**

Count VII alleges a claim for violation of the Florida Securities and Investor Protection Act ("FSIPA") against the Director Defendants, Cortado, and Maisonette. To allege a claim under FSIPA, a plaintiff must plead:

> (1) a misrepresentation or omission of a material fact; (2) justifiabl[e] reli[ance]; (3) that the misrepresentation or omission was made in connection with a purchase or sale of securities; (4) with scienter or reckless disregard as to the truth of the communication; and (5) that the untruth was the direct proximate cause of the loss.

*Compania de Elaborados de Café v. Cardinal Cap. Mgmt., Inc.*, 401 F. Supp. 2d 1270, 1280 (S.D. Fla. 2003).

38

Because the elements of a FSIPA claim closely track a claim for common law fraud under Delaware law, Defendants incorporate their prior arguments in support of dismissal. *See* Maisonette OB at 45 ("Because the factual allegations underlying [Plaintiffs'] FSIPA claim are the same as those underlying its common law fraud claim . . . this claim fails for the same reasons [Plaintiffs'] fraud claim fails."). Therefore, to the extent portions of Count I survive, Count VII also survives.[17]

## E. Count II States A Claim For Civil Conspiracy To Commit Fraud.

Count II of the Complaint alleges a claim against all Defendants for civil conspiracy to commit fraud. According to the Complaint, Maisonette, the Director Defendants, and Cortado made or directed fraudulent statements to Plaintiffs to induce them to enter into the Note, the Series C SPA, and the Series D SPA, and NEA 15 conspired with them to do so. *See* Compl. ¶¶ 173, 175–77.

"To state a claim for civil conspiracy, a plaintiff must allege[:] '(1) the existence of a confederation or combination of two or more persons; (2) that an

---

[17] Cortado argues that the Complaint fails to state a FSIPA claim against her because she is not alleged to have "aided in making the sale or purchase." *See* Cortado OB at 12–13 (citing Fla. Stat. § 517.211 (2025)). Assuming that is the correct standard, the Complaint alleges that Cortado prepared and delivered misstated financial statements to Plaintiffs, supporting a FSIPA claim. *Contrast Dillon v. Axxsys Int'l, Inc.*, 385 F. Supp. 2d 1307, 1313 (M.D. Fla. 2005) (dismissing FSIPA claim against an officer who "had nothing to do with the sale"), *aff'd*, 185 F. App'x 823 (11th Cir. 2006), *with* Compl. ¶ 89 ("[I]n preparation for the Series C financing, Cortado prepared . . . updated versions of the Company's financial statements . . . .").

unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff.'" *LVI Gp. Invs.*, 2018 WL 1559936, at \*14 (quoting *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006)). "Like fraud, conspiracy to commit fraud must be pled with particularity, though knowledge may be averred generally." *Id.* (citing *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at \*20 (Del. Ch. Nov. 26, 2014)). To show a confederation, a plaintiff must allege that there was a "meeting of the minds between or among" the alleged co-conspirators "relating to the object [of the conspiracy] or [a] course of action." *Altabef v. Neugarten*, 2021 WL 5919459, at \*8 (Del. Ch. Dec. 15, 2021) (quoting *Lake Treasure Hldgs., Ltd. v. Foundry Hill HP LLC*, 2013 WL 6184066, at \*3 (Del. Ch. Nov. 21, 2013)).

Defendants advance two primary arguments for dismissing Count II. First, Defendants argue that the Complaint fails to allege facts supporting a reasonable inference that NEA 15 was part of a confederation to commit fraud or committed any act in furtherance of a conspiracy. Second, Defendants submit that without NEA 15 as a member of the alleged conspiracy, Plaintiffs impermissibly allege a conspiracy solely among a company and its fiduciaries.

The Complaint adequately alleges that NEA 15 entered into a "confederation or combination" with Maisonette's fiduciaries to commit fraud in connection with the Note and the Series C SPA. NEA 15 asserts that the Complaint fails to plead

40

facts suggesting a "meeting of the minds between or among" the alleged co-conspirators. NEA OB at 13. Reviewing the collective allegations of the Complaint, I find "the pled behavior of the alleged conspirators" supports a pleadings-stage inference of such a confederation. *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 806 (Del. Ch. 2009), *aff'd sub nom., Tchrs.' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011) (TABLE).

The Complaint alleges that through a series of financings beginning in 2018, NEA 15 became Maisonette's largest stockholder. *See* Compl. ¶¶ 11, 36, 38, 42. By 2021, NEA 15 learned of Maisonette's "dire financial condition" through Florence's service on the Board. Compl. ¶ 175. According to the Complaint, to "bail out their existing investments and preserve their existing roles in Maisonette[,]" NEA 15 conspired to induce Plaintiffs to invest "substantial new money" in the Company in order to "keep [NEA 15's] substantial prior investments in the Company afloat." *Id.* ¶¶ 75, 175.

Admittedly, some of the factual allegations on which Plaintiffs premise this theory are thin. For instance, the Complaint alleges that weeks before Plaintiffs received the October 2021 Financial Statements in connection with the Note, two NEA 15 employees participated in a "closed-door session" with Maisonette to discuss fundraising. *Id.* ¶ 48. Aside from speculating about what might have happened behind the "closed door," the Complaint does not allege any facts

41

suggesting wrongdoing occurred at that meeting. *See id.* This allegation, standing alone, would not support an inference of a conspiracy to commit fraud.

But the Complaint alleges more. The Complaint alleges that Maisonette touted NEA 15's participation in the Series C and Series D financing rounds to convince Plaintiffs to invest. *See id.* ¶ 57 (noting that the Series C Pitch Deck lauded "NEA's role as an investor in the Company and its track record of other successful investments"); *see also, e.g.*, *id.* ¶¶ 75, 130 (alleging that Maisonette represented to Plaintiffs that NEA 15 would invest in the Series C and Series D financing rounds only if Plaintiffs "first put up a substantial amount of new money"). The Complaint alleges that NEA 15, through Florence, negotiated the terms of the Series C financing directly with Plaintiffs. *See* Compl. ¶ 115 (alleging that Plaintiffs "negotiated the terms of the transaction with Florence and NEA"); *id.* ¶ 131 (alleging Plaintiffs "negotiated the terms of the transaction with the Company and Florence and NEA 15," during which "NEA 15 resisted granting [Plaintiffs] Board designee consent rights" but ultimately "relented and consented to grant [Plaintiffs] the governance rights it sought to secure [Plaintiffs'] further investment, which NEA and the Company badly desired"). And the Complaint also alleges that Florence, acting to advance NEA 15's interests, oversaw Maisonette's fundraising efforts, approved the Series C Pitch Deck and the Updated Financial Statements as well as the Series C SPA and Series D SPA, and omitted that he was a defendant in the Casper

42

Litigations. *See* Compl. ¶¶ 57, 68, 89, 97, 100, 107–08, 134, 166. It is conceivable, based on those allegations, that NEA 15 reached "an agreement or common design" with Maisonette and the other Defendants to defraud Plaintiffs.[18] *Prairie Cap.*, 132 A.3d at 63.

NEA 15 argues that Florence's conduct in negotiating and approving the subject transactions cannot be attributed or "imputed" to NEA 15. To hold NEA 15 responsible for Florence's conduct, Florence must have acted at the direction of NEA 15—or, to say it differently, he must have acted as NEA 15's agent. *See In re Elec. Last Mile Sols., Inc. S'holder Litig.*, 2026 WL 207195, at *6 (Del. Ch. Jan. 27, 2026). The challenge here is that the Court cannot determine on the pleadings that Florence acted solely on behalf of Maisonette, rather than at the behest of NEA 15. *See LVI Gp. Invs.*, 2018 WL 1559936, at *15 (acknowledging that "dismissal might be appropriate" where individuals are "wearing only their [company] hats when engaged in the conspiracy," but explaining that "at the pleading stage, I cannot exclude the possibility that the [i]ndividual [d]efendants were acting solely as agents of [one entity] when they purportedly conspired with [another entity and its CEO]").

---

[18] Defendants rely on *In re Swervepay Acquisition, LLC*, 2022 WL 3701723 (Del. Ch. Aug. 26, 2022), in which the Court dismissed a seller's claim for conspiracy to commit fraud against a group of unaffiliated buyer entities and their agents that was supported only by "threadbare contentions" of "participation at deal meetings" and communications among deal participants. *Id.* at *13. The Complaint alleges more than arm's-length negotiations, as set forth above.

One inference to be drawn is that Florence's actions were taken on behalf of NEA 15.

NEA 15 separately argues that if it "suspected there were inaccuracies in the Series C pitch deck or other financial information, it goes without saying that NEA 15 would not have continued to invest in Maisonette." NEA OB at 14–15. The Complaint offers an alternative narrative: that NEA 15 was willing to participate in the Series C and Series D financing rounds despite knowing of Maisonette's "dire" financial condition because this was the only way to secure Plaintiffs' substantial investment. Compl. ¶¶ 75, 175. At this stage, the Court cannot weigh competing inferences and must instead draw all reasonable inferences in Plaintiffs' favor.

This conclusion forecloses Defendants' secondary dismissal argument, that the Complaint impermissibly alleges a conspiracy solely among Maisonette and its fiduciaries. "[A]s a general rule, agents of a corporation cannot conspire with one another or aid and abet each other's torts." *Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *17 (Del. Ch. June 11, 2020); *see also In re Transamerica Airlines, Inc.*, 2006 WL 587846, at *6 (Del. Ch. Feb. 28, 2006) ("[A] corporation generally cannot be deemed to have conspired with its wholly owned subsidiary, or its officers and agents."). But because the Complaint adequately alleges NEA 15 as a member of the conspiracy, this argument is inapposite.

Accordingly, the Motions to Dismiss Count II must be denied.

44

**F.** **Count VI States A Claim Against NEA 15 For Aiding And Abetting Breach Of Fiduciary Duty.**

Count VI alleges a claim for aiding and abetting breach of fiduciary duty against NEA 15.

To state a claim for aiding and abetting breach of fiduciary duty, a plaintiff must allege: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 389 (Del. 2024) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)). Knowing participation requires both "knowledge and participation." *Id.* at 390. Knowledge requires that "an aider and abettor know that the [fiduciary's] conduct constitutes a breach" and "that their conduct was legally improper." *Id.* at 390–91; *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015). "[P]articipation in an aiding and abetting claim requires that the aider and abettor provide 'substantial assistance' to the primary violator." *Mindbody*, 332 A.3d at 392. "[F]actors that shed light on whether a secondary actor has substantially assisted the primary actor in its wrongful conduct" include:

- The nature of the tortious act that the secondary actor participated in or encouraged, including its severity, the clarity of the violation, the extent of the consequences and the secondary actor's knowledge of these aspects;

45

- The amount, kind, and duration of assistance given, including how directly involved the secondary actor was in the primary actor's conduct;

- The nature of the relationship between the secondary and primary actors; and

- The secondary actor's state of mind.

*In re Columbia Pipeline Gp., Inc. Merger Litig.*, 342 A.3d 324, 358 (Del. 2025) (citing *Mindbody*, 332 A.3d at 395–96).

As explained above, the allegations of the Complaint support an inference that the Director Defendants breached their fiduciary duty of disclosure by approving the false Absence of Litigation Representation in the Series D SPA when seeking stockholder approval to amend Maisonette's certificate of incorporation. *See supra* pp. 35–38. NEA 15 argues that the Complaint fails to sufficiently allege that NEA 15 knowingly participated in that alleged breach of duty.

NEA 15's knowledge is adequately pled here because (1) the Complaint pleads facts sufficient to infer that Florence knew, based on his own status as a defendant in the Casper Litigations, that the Absence of Litigation Representation was false and misleading and constituted a breach of the Director Defendants' fiduciary duties; and (2) Florence's knowledge may be imputed to NEA 15 on a motion to dismiss. *See Tchrs.' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 & n.23 (Del. Ch. 2006) (explaining that an entity "is fairly charged with the knowledge and conduct of its controlling persons" since "it is the general rule that knowledge of an

officer or director of a corporation will be imputed to the corporation"); *Khanna v. McMinn*, 2006 WL 1388744, at *27 (Del. Ch. May 9, 2006) ("[The individual's] status as a . . . director and General and Managing Partner of [an entity] is sufficient to impute knowledge of [his] conduct with respect to the BlueStar acquisition to [that entity], for purposes of this motion to dismiss."); *Carlson v. Hallinan*, 925 A.2d 506, 542 (Del. Ch. 2006) ("[Plaintiffs] satisfy the knowing participation element of the claim because [the individual's] knowledge as a director and officer of both [entities] is imputed to them." (footnote omitted)), *op. clarified*, 2006 WL 1510759 (Del. Ch. May 22, 2006).

Whether NEA 15 can be said to have substantially participated in the alleged fiduciary breach presents a closer question. Plaintiffs argue that NEA 15 "actively supported" the Director Defendants' disclosure violation by "keep[ing] Florence on the Board" and by voting as a stockholder to amend Maisonette's certificate of incorporation. PAB at 60–62. As Defendants point out, Plaintiffs' argument that NEA 15 participated in a disclosure violation by keeping Florence on the Board is tantamount to arguing that NEA 15 "passively stood by while [Florence] breached [his] disclosure duty[,]" which is insufficient to support a claim for aiding and abetting. *See Mindbody*, 332 A.3d at 401. Additionally, to the extent NEA 15 took steps to consummate its own investment in the Series D financing round, that conduct does not support an inference that NEA 15 facilitated the Director

47

Defendants' failure to disclose material information to stockholders. *See In re Xura, Inc., S'holder Litig.*, 2018 WL 6498677, at \*15 (Del. Ch. Dec. 10, 2018) (dismissing aiding and abetting claim where the complaint "pled no facts to support an inference that [the alleged aider-and-abettor] knowingly facilitated alleged disclosure deficiencies or otherwise 'knowingly participated' *in that aspect* of the alleged breach of fiduciary." (emphasis added)).

Importantly, however, the Complaint also alleges that Florence oversaw Maisonette's fundraising efforts and approved the Series D SPA, including the false Absence of Litigation Representation that failed to disclose the Casper Litigations in which he personally was a defendant. *See* Compl. ¶¶ 57, 68, 89, 97, 100, 107–08, 134, 166; PAB at 61–62. On one hand, solely pointing to Florence's conduct is insufficient to demonstrate that *NEA 15* participated in a breach. *See, e.g.*, *Caerus Gp., LLC v. Chemicar Eur. NV*, 2026 WL 668208, at \*10 (Del. Ch. Mar. 10, 2026) (rejecting an argument that a director and officer's conduct was sufficient to support a claim for aiding and abetting against an entity where the complaint failed to allege that the entity took any action beyond "assistance"); *Renovaro Inc. v. Gumrukcu*, 2025 WL 3134533, at \*11 n.136 (Del. Ch. Nov. 7, 2025) (explaining that "knowledge can be imputed from a human to an entity in certain scenarios," "[b]ut action by the entity must be pled to state a claim against the entity"); *In re Hennessy Cap. Acq. Corp. IV S'holder Litig.*, 318 A.3d 306, 329 (Del. Ch. 2024) (explaining

48

that even where a director's knowledge is imputed to another entity, the complaint must allege "actual participation" *by the entity*), *aff'd*, 337 A.3d 1214 (Del. 2024) (TABLE).  On the other hand, as explained above in the context of Plaintiffs' conspiracy claim, the Complaint pleads facts making it reasonably conceivable that Florence's actions were taken at the behest and to further the interests of NEA 15, such that NEA 15 itself can be said to have acted in furtherance of the wrongful conduct.  *See supra* pp. 40–44; *see also Calumet Cap. P'rs LLC v. Victory Park Cap. Advisors, LLC*, 2026 WL 374887, at *18 (Del. Ch. Jan. 29, 2026) ("That [disloyal conduct] is inferably what the [i]nvestor wanted him to do, and he did it.").[19]  These allegations support a pleadings-stage inference that NEA 15, through Florence, actively participated in the Director Defendants' breach of fiduciary duty.  Again, the factual record will reveal whether Florence's actions can in fact be attributed to NEA 15, but at this stage, the Complaint states a conceivable claim for aiding and abetting.

---

[19] On March 4, 2026, Plaintiffs submitted *Calumet Capital Partners LLC v. Victory Park Capital Advisors* as supplemental authority to support their aiding and abetting claim.  Dkt. 75.  In *Calumet*, a director-designee allegedly misappropriated confidential information from the plaintiff company in order to advance the interests of his employer who designated him to the board.  2026 WL 374887, at *18.  The Court found it was reasonable to infer that the director "engaged in disloyal conduct for the purpose of advancing [his employer's] campaign" to unfairly compete with the company and that he "worked on the inside" to support his employer's efforts, satisfying both the knowledge and substantial participation elements of "knowing participation."  *Id.*

The Motions to Dismiss Count VI are denied.

**G. Count VIII States A Claim For Equitable Fraud Against Maisonette And The Director Defendants For Misstatements In Connection With The Series D SPA Only.**

Count VIII alleges a claim for equitable fraud against Maisonette, the Director Defendants, and NEA 15 in connection with the Note, the Series C SPA, and the Series D SPA.

Equitable fraud "requires proof of all of the elements of common law fraud except 'that plaintiff need not demonstrate that the misstatement or omission was made knowingly or recklessly.'" *Williams v. White Oak Builders, Inc.*, 2006 WL 1668348, at *7 (Del. Ch. June 6, 2006) (quoting *H-M Wexford*, 832 A.2d at 144). The scienter requirement is substituted for either "(i) a special relationship between the parties over which equity takes jurisdiction (like a fiduciary relationship) or (ii) justification for a remedy that only equity can afford." *Fortis Advisors*, 2015 WL 401371, at *9 (quoting *Envo, Inc. v. Walters*, 2009 WL 5173807, at *6 (Del. Ch. Dec. 30, 2009), *aff'd*, 2013 WL 1283533 (Del. Mar. 28, 2013) (TABLE)). In other words,

> [t]o state a claim for negligent misrepresentation, a plaintiff must show: (1) "a particular duty to provide accurate information, based on the plaintiff['s] pecuniary interest in that information;" (2) "the supplying of false information;" (3) "failure to exercise reasonable care in obtaining or communicating information; and" (4) "a pecuniary loss caused by justifiable reliance on the false information."

50

*Neurvana Med.*, 2020 WL 949917, at \*23 (quoting *H-M Wexford*, 832 A.2d at 147 n.44).

Defendants move to dismiss Count VIII on grounds that "(i) it suffers the same flaws as their common law fraud claim; and (ii) no special or fiduciary relationship existed between the parties until after the execution of the Series C SPA." Maisonette OB at 45. The first argument is adequately addressed (and rejected) above. *See supra* pp. 14–33. Count VIII states a claim against the Director Defendants and Maisonette[20] to the extent it is premised on the Series D SPA, at which point the Director Defendants stood in a fiduciary relationship to Plaintiffs.

As for their second argument, Defendants are correct that Plaintiffs' equitable fraud claim cannot stand to the extent it is premised on the Note or the Series C SPA, as no special relationship existed until they owned preferred stock. *See Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 144 (Del. Ch. 2009) (holding that there were no "special circumstance[s] that would merit exercising this Court's equitable power to go beyond the traditional framework of common law fraud" where both parties were "sophisticated" and "negotiated [the deal] at arms' length").

Plaintiffs contend that Count VIII nonetheless states a claim for equitable fraud in connection with the Note and the Series C SPA because "it is reasonably

---

[20] Maisonette does not identify the lack of a special relationship with Plaintiffs as a basis to dismiss this claim against the Company. *See* Maisonette OB at 45–47.

conceivable that an equitable remedy is appropriate," suggesting "rescission or rescissory damages" could be "necessary to redress [Plaintiffs'] fraud claims." PAB at 72. But Plaintiffs make no attempt to explain why legal rescission (as opposed to equitable rescission) would not provide an adequate remedy at law. *See In re Tesla, Inc. Deriv. Litig.*, 2025 WL 3689114, at \*11 (Del. Dec. 19, 2025) ("In Delaware, legal rescission is awarded by courts of law to invalidate a contract and award the plaintiff money or property of which they have been deprived."). Because the Complaint fails to plead "that an action at law for damages would not provide an adequate remedy and that only equity will afford it full, fair, and complete relief," Count VIII is dismissed to the extent it is premised on the Note and the Series C SPA. *See Envo*, 2009 WL 5173807, at \*6.

Count VIII also fails to state a claim for equitable fraud against NEA 15 in connection with the Series D SPA because the Complaint does not allege that NEA 15 had a special relationship with Plaintiffs. Plaintiffs argue that Florence's knowledge and conduct are imputed to NEA 15 such that it may be held "liable for acts taken by Florence to facilitate the fraud." PAB at 73. Plaintiffs cite no authority for the proposition that independent of a conspiracy or aiding and abetting claim, NEA 15 may be held vicariously liable for the actions of Florence. *See Shafi v. Chien*, 2025 WL 671854, at \*17 (Del. Ch. Mar. 3, 2025) (rejecting a plaintiff's

attempt to "extend [vicarious] liability to [a] non-fiduciary [stockholder] using the doctrine of respondeat superior" (citing *Khanna*, 2006 WL 1388744, at \*28)).

As set forth above, the Motions to Dismiss Count VIII are granted in part and denied in part.

### H. Count IX Fails To State A Claim For Conversion.

Count IX alleges a claim for conversion against Maisonette. As alleged in the Complaint, Maisonette committed conversion by "wrongfully and tortiously divest[ing] [Plaintiffs] of . . . the rights [they] enjoyed under the Note by fraudulent[ly] executing the Series C SPA." Compl. ¶¶ 232–33.

"Conversion is 'any distinct act of dominion wrongfully exerted over the property of another, in denial of [the plaintiff's] right, or inconsistent with it.'" *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009) (alteration in original) (quoting *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933)). "Generally, the necessary elements for a conversion under Delaware law are that a plaintiff had a property interest in the converted goods; that the plaintiff had a right to possession of the goods; and that the plaintiff sustained damages." *Goodrich v. E.F. Hutton Gp., Inc.*, 542 A.2d 1200, 1203 (Del. Ch. 1988). "For a plaintiff to recover under a theory of conversion, he must prove, *inter alia*, precisely what property the defendant converted and that his interest in the property was viable at the time of the

conversion." *CIT Commc'ns Fin. Corp. v. Level 3 Commc'ns, LLC*, 2008 WL 2586694, at *2 (Del. Super. Ct. June 6, 2008).

Under the terms of the Note, Plaintiffs' right to the outstanding principal and accrued interest on the Note was automatically "converted into equity securities at the initial closing of" the Series C financing. Note § 2(a). Plaintiffs appear to argue that they lost valuable contract rights under the Note as a result of Defendants' fraudulent statements. But Defendants' alleged fraud did not induce the conversion—conversion was automatic upon closing of the Series C financing. I am also unconvinced that the contract rights that were "converted into equity securities" under the Note are "property" or "chattel" capable of being "converted" as a tort. Although "[t]he types of property that can be converted include intangible property[,]" *Bamford v. Penfold, L.P.*, 2020 WL 967942, at *22 (Del. Ch. Feb. 28, 2020), Plaintiffs cite no authority supporting the unusual proposition that a contractual right to repayment of principal and interest owed on a note can be "converted."

This claim is more appropriately cast as fraud or breach of contract, as analyzed above; there is no need to create novel conversion theories. Count IX is dismissed.

## I.       Count X States A Claim For Unjust Enrichment.

Count X alleges an alternative claim for unjust enrichment against all Defendants. Plaintiffs allege that Defendants' misrepresentations "unjustly deprived [Plaintiffs] of its rights under the Note" and induced Plaintiffs "to join in the purchase of additional shares of Series C Preferred Stock." Compl. ¶ 238.

To state a claim for unjust enrichment, a plaintiff must allege "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, [and] (4) the absence of justification." *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 875 (Del. 2020) (quoting *Nemec*, 991 A.2d at 1130).

As an initial matter, I "reject [Defendants'] argument that the unjust enrichment claim is precluded by the parties' contractual relationship." *See Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *17 (Del. Ch. Dec. 22, 2010). It is true that "[i]f a contract comprehensively governs the parties' relationship, then it alone must provide the measure of the plaintiff's rights and any claim of unjust enrichment will be denied." *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009). "In some situations, however, both a breach of contract and an unjust enrichment claim may survive a motion to dismiss when pled as alternative theories of recovery." *Narrowstep*, 2010 WL 5422405, at *16 (emphasis omitted). The allegations

underlying Plaintiffs' fraud claim do not solely concern the parties' contractual relationship and conceivably could "figure in the determination of an appropriate remedy." *Id.* at \*17; *see also City of Pittsburgh Comprehensive Mun. Pension Tr. Fund v. Conway*, 2024 WL 1752419, at \*27 n.290 (Del. Ch. Apr. 24, 2024) (explaining that where dismissing potentially duplicative claims "is unlikely to simplify discovery or the presentation of evidence, and because there is no right to a pleading stage ruling, there is no benefit to be gained from dismissing [an] unjust enrichment claim"); *Trust Robin, Inc. v. Tissue Analytics, Inc.*, 2022 WL 17423728, at \*6 (Del. Ch. Dec. 2, 2022) ("At the pleading stage, . . . it is appropriate to permit the [unjust enrichment] claim to stand, pending development of a record on the contract claim.").

The Complaint alleges facts to support the elements of an unjust enrichment claim. Based on the allegations in the Complaint and reasonable inferences drawn from them, Plaintiffs have alleged sufficient facts to demonstrate that Maisonette induced Plaintiffs' investment in the Note and Series C SPA through misstatements, enriching Maisonette to Plaintiffs' detriment.

The same can be said of the Director Defendants. Defendants contend that the Complaint fails to allege that the Director Defendants, Cortado, or NEA 15 were enriched by Plaintiffs' investments. Although those Defendants did not receive the funds directly, Plaintiffs argue that their investments unjustly enriched all

56

Defendants by "extend[ing] the runway on their investments" to buy time for Maisonette's financial position to turn around or for Defendants to "offload their equity on some other, unsuspecting investor." PAB at 69–70. Defendants may later prove that they did not in fact receive any benefit to disgorge. But at the pleading stage, I must credit Plaintiffs' allegations and cannot draw competing inferences in Defendants' favor. *See Principal Growth Strategies, LLC v. AGH Parent LLC*, 2024 WL 274246, at *13 (Del. Ch. Jan. 24, 2024).

The Motions to Dismiss Count X for unjust enrichment are denied.

## III. CONCLUSION

The Motions to Dismiss are granted in part and denied in part. The parties are directed to meet and confer on a form of order to implement this decision.